**IN THE DISTRICT COURT OF THE UNITED STATES**
**DISTRICT OF SOUTH CAROLINA**
**ANDERSON/GREENWOOD DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No.: 8:25-cr-00684-JDA-1 |
| | ) | |
| v. | ) | **SENTENCING MEMORANDUM AND** |
| | ) | **MOTION FOR DOWNWARD VARIANCE** |
| | ) | |
| DAVID LYNN WELLS | ) | |

### I.    INTRODUCTION

David Lynn Wells is yet another, tragic human annal of the proverb, "Hurt people hurt people."[1] His life is a story of prolonged abuse that started before he was born when David's father assaulted his mother by striking her in the stomach.[2] David's story continued in much the same way: the hits just kept on coming—literally and figuratively. In every chapter of his life, David was hurt by trauma, abandonment, neglect, mental illness, and substance abuse, among other things. But, after a one-night stand with a high school girlfriend, David started a new chapter: Father. *See* PSR paragraph 67. A new chapter filled with all the hope that comes with the blessing of children, but an old story—David's story. Like David's father hurt David, though he wasn't the only one, David hurt his son. Such an outcome wasn't inevitable, hence David's decision to accept responsibility and plead guilty. But the path David traveled from abused to abuser, from victim to perpetrator, is well-known

---

[1] The earliest recordation of "Hurt people hurt people" in the United States is found in the February 26, 1959 edition of the Amarillo Globe-Times, a local Texas newspaper. *See* Matthew Phelan, The History of "Hurt People Hurt People", *Brow Beat*, Slate (Sep. 17, 2019, 3:02PM), https://slate.com/culture/2019/09/hurt-people-hurt-people-quote-origin-hustlers-phrase.html?pay=1776760948316&support_journalism=please. The Globe-times recounted that Charles Eads, "made a statement that might give pause to a student of psychology. It's worded peculiarly. The statement is, 'Hurt people hurt people.' So, maybe before I wound someone next time, I'll stop and think if it's because I've been hurt, myself. I'll try to remember.

[2] ***SCDMH Competency to Stand Trial Report April 6, 2021***

and unremarkable to the mental health, child protective, and criminal systems in America. And that is just another tragedy. The question of what is a sufficient, but not greater than necessary, sentence for David places the Court at the intersection of multiple tragedies—an unenviable position. But one that is navigable using the factors outlined in 18 U.S.C. § 3553(a), social science, persuasive opinions from other judges and courts, and that sometimes elusive response to suffering that should be indiscriminate: compassion.

## II.     LEGAL FRAMEWORK

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81,113 (1996). "As a matter of administration and to secure nationwide consistency," correctly calculating the United States Sentencing Commission Guidelines ("USSG" or the "Guidelines") range is the starting point of the federal sentencing process. *Gall v. United States*, 552 U.S. 38, 50 (2007). However, the Guidelines range is "one factor among several" to be considered in imposing an appropriate sentence under 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Guidelines are not mandatory, *Gall*, 552 U.S. at 59, and the Court should not "presume that the Guidelines range is reasonable," *id.* at 50. *See also Rita v. United States*, 551 U.S. 338, 351 (2007) (stating that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations"). Instead, the Court must consider all the § 3553(a) factors and "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. Such consideration is necessary for the Court to fulfill its "overarching duty under § 3553(a) 'to impose a sentence sufficient, but not greater than necessary[]' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Pepper v. United States*, 562 U.S. 476, 491 (2011). "In view of the excessive incarceration rates in the recent past and their

unnecessary, deleterious effects on individuals sentenced, society, and our economy, parsimony in incarceration is to be prized." *United States v. D.W.*, 198 F. Supp. 3d 18, 126 (E.D.N.Y. 2016).

"[C]ourts may vary [from the Guidelines] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101–02. *See also Rita v. United States*, 551 U.S. 338, 351 (2007) (stating that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations"). Congressionally-directed Guidelines are just as advisory as any other Guideline and therefore equally subject to policy-based variances. In *Vazquez v. United States*, 558 U.S. 1144 (2010), the Supreme Court remanded for reconsideration in light of then-Solicitor General Kagan's position that "all [G]uidelines," including congressionally-directed Guidelines, "are advisory, and the very essence of an advisory [G]uideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing sentencing under Section 3553(a)." U.S. Br. at 11, *Vazquez v. United States*, No. 09-5370 (Nov. 2009). Congressional directives "tell[] the Sentencing Commission, not the courts, what to do," and "a directive that the Commission specify a particular Guidelines range is not a mandate that sentencing courts stay within it." *United States v. Michael*, 576 F.3d 323, 328 (6th Cir. 2009).

As the Supreme Court has acknowledged, the weight afforded to the Guidelines calculations is owed in part due to the empirical approach typically employed by the United States Sentencing Commission, which "fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough v. United States*, 552 U.S. 85, 108—09 (2007) (internal quotation marks omitted). But by the same line of reasoning, the Guidelines for a particular offense are entitled to very little weight when the Guidelines

"do not exemplify the Commission's exercise of its characteristic institutional role," that is, without reference to empirical data. *Id.* In these cases, a sentencing court may well conclude that a Guidelines sentence "yields a sentence greater than necessary to achieve [18 U.S.C.] § 3553(a)'s purpose." *Id.* Nowhere is this truer than in the Guidelines prescribed for child pornography offenses, where "the Commission did not use [its typical] empirical approach in formulating the Guidelines for child pornography." *United States v. Dorvee*, 616 F.3d 174, 184—88 (2d Cir. 2010) (reversing a Guidelines range sentence as substantively unreasonable).

## III.     THE 3553(a) FACTORS

### a.  David's History and Characteristics

David's history and characteristics are largely defined by adverse childhood experiences, ACEs. ACEs are "potentially traumatic events that occur in childhood (0-17 years)." U.S. Centers for Disease Control and Prevention (CDC), *About Adverse Childhood Experiences*, https://www.cdc.gov/aces/about/index.html (last visited Apr. 16, 2026). Generally, ACEs refer to three specific kinds of adversity children face in the home environment—various forms of physical and emotional abuse, neglect, and household dysfunction. Examples of ACEs include, but are not limited to:

- experiencing violence, abuse, or neglect;
- witnessing violence in the home or community;
- having a family member attempt or die by suicide;
- substance use problems;
- mental health problems;
- instability due to parental separation;
- instability due to household members being in jail or prison;

4

- not having enough food to eat;

- experiencing homelessness; and

- unstable housing.

*Id.* ACEs were first identified by the CDC and the Kaiser Permanente health care organization in California during a groundbreaking study published in the 1990s that investigated "the long-term impact of abuse and household dysfunction during childhood on the following outcomes in adults: disease risk factors and incidence, quality of life, health care utilization, and mortality." Vincent J. Felitti, MD, FACP, Robert F. Anda, MD, MS, et. al., *Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults the Adverse Childhood Experiences (ACE) Study*, 14 Am. J. Preventive Med. 245, 246 (1998).

The ACEs study has been replicated and expanded by researchers, clinicians, and policy makers to understand the root causes of, *inter alia*, and most relevant to David's case, sexual violence. *See*, Melissa D. Grady, Jill S. Levenson, et. al., *"Hurt People Hurt Other People": The Link Between Past Trauma and Sexual Offending*, 17 Sexual Offending: Theory, Research, and Prevention 1, 3 (2022) [hereinafter *Hurt People*]. This expansion resulted in the "well-documented high rates of . . . ACEs among individuals who have committed sexual crimes. Research demonstrates the direct and indirect relationships between various ACEs and subsequent criminal behavior." *Id.* (internal citations omitted). The researchers in *Hurt People* explain that,

> Trauma is described as an event that feels threatening to a person's physical safety or psychological well-being; the circumstances are usually out of a person's control and can overwhelm their normal capacity to cope with stress. Childhood adversity is not typically an isolated event, and it can therefore create a web of experiences by which a child organizes an understanding of self, others, and the world. ACEs include child neglect, physical and sexual abuse, and family dysfunction such as domestic violence, addiction, absent parents, mental illness, and criminality. Exposure to ACEs can stimulate

distorted cognitive schemas, poor self-regulation capacities, and unhealthy attachment styles, all of which can contribute to risk for engaging in crime.

Compared to the general population, individuals who committed sex crimes reported higher rates of child sexual abuse, physical abuse, verbal abuse, and emotional neglect, and they were more likely to be raised by single parents in turbulent households. Compared to other adolescents in the juvenile justice system, youth who sexually offended had significantly higher prevalence rates of physical abuse, sexual abuse, physical neglect, and household dysfunction. Moreover, researchers have found correlations between the number of adverse events experienced in childhood and the severity and frequency of violence and criminal conduct. People with a criminal conviction for sex crimes tend to have higher rates of complex trauma, defined as the accumulation of multiple traumas that are often chronic and unrelenting.

*Id.* at 4.[3] In a study of "data [] collected from more than 700 convicted sexual offenders in outpatient and confinement-based treatment programs throughout the U.S.[,] [u]sing the 10-item . . . ACE[] Scale", researchers found that:

- "childhood adversity was associated with sexual deviance and sexual violence for male sex offenders, suggesting that the accumulation of early trauma can increase the likelihood of sexual and general self-regulation difficulties later in life";

- "[c]onsistent with developmental and attachment theories of criminality and sexual offending, the findings supported the hypothesis that higher ACE scores would be associated with indicators of sexual deviance and sexual violence";

- "[t]he findings offer some insight into the different pathways leading to sexually deviant and sexually violent behaviors. Predictors of deviance included childhood sexual abuse, emotional neglect, mental illness in the home, and unmarried parents";

- "[t]he abused or neglected child, as an adult, may tend to seek out younger individuals whom he perceives as looking up to him and who will not hurt him. His victim choices are 'safe' and therefore he feels less vulnerable";

---

[3] *See also*, Jill S. Levenson, Melissa D. Grady, et. al, *The Influence of Childhood Trauma on Sexual Violence and Sexual Deviance in Adulthood*, 22 Traumatology 94 (2016) [hereinafter "Childhood Trauma"] ("As ACEs accumulate, the risk for numerous health, mental health, and behavioral problems in adulthood has been observed to increase in a dose–response fashion. Among the negative sequelae of early trauma is increased risk for criminal behavior, including sexual perpetration.").

- "predictors of violence included physical child abuse, substance abuse in the home, and having an incarcerated family member"; and finally,

- "[i]t is therefore possible that sexual violence and deviance, in many cases, can be traced back to insecure attachments that were formed through adverse childhood experiences. The link between child abuse and neglect and later offending behavior is well established".

Jill S. Levenson, Melissa D. Grady, et. al, *The Influence of Childhood Trauma on Sexual Violence and Sexual Deviance in Adulthood*, 22 Traumatology 94, 99–100 (2016) [hereinafter "Childhood Trauma"].

Courts and judges are aware that as the number of ACEs goes up, so does the likelihood and severity of criminal offense. Judge Myron H. Thompson of the Middle District of Alabama, honored for his "[c]ommitment to [a]dvancing . . . [h]uman [d]ignities",[4] often acknowledges the undeniable truth of the criminal consequences of ACEs when sentencing defendants under 18 U.S.C. § 3553(a). For example, in *United States v. Carter*, Judge Thompson found that,

> [F]ailing to consider whether Carter's trauma contributed to his conduct would turn a blind eye to the *well-documented consequences of adverse childhood experiences and would risk punishing Carter for a mental-health condition* just as much as it would to punish a drug-addicted individual for drug possession without considering the impact of his or her disorder. For this reason, the court turned to considering what role, if any, Carter's adverse childhood experiences played in his commission of the current offense and whether the impacts of his trauma affected what sentence was appropriate for his conduct under the factors of 18 U.S.C. § 3553(a). . . .
>
> there are 10 basic categories of ACEs: emotional abuse; physical abuse; sexual abuse; witnessing domestic violence; substance abuse in the home; mental illness in the home; parental separation or divorce; having an incarcerated family member; emotional neglect; and physical neglect. A person's risk of serious, long-term adverse effects becomes very high once the individual has experienced four of these 10 categories.

---

[4] *See* United States District Court Middle District of Alabama, Judge Myron H. Thompson, https://www.almd.uscourts.gov/judges/myron-h-thompson (last visited Apr. 18, 2026).

506 F. Supp. 3d 1204, 1210–11 (M.D. Ala. 2020) (citation omitted) (emphasis added). Judge Thompson's acceptance of the truth of the long-term, adverse effects of ACEs wasn't limited to *Carter*, as he has since relied on the science of ACEs in several more cases. *See, e.g., United States v. McLean*, No. 2:21CR335-MHT, 2022 WL 893533, at \*2 (M.D. Ala. Mar. 25, 2022) ("[T}he effect of . . . ACEs on a defendant's criminal conduct goes 'squarely to the application of § 3553(a)(1).'" (quoting *Carter*, 506 F. Supp. 3d at 1212)); U*nited States v. Powell*, 582 F. Supp. 3d 1115, 1117 (M.D. Ala. 2021) ("This court has previously found, 'A person's risk of serious, long-term adverse effects becomes very high once the individual has experienced four of these 10 categories.'" (quoting *Carter*, 506 F. Supp. 3d at 1211)).

Like the defendants before Judge Thompson, and courts all over this country, David has experienced numerous ACEs. Many more than four. In response to the "Childhood Experiences Survey" that defense counsel asks all her clients to complete, David reported experiencing the following ACEs:

**CHILDHOOD EXPERIENCES SURVEY**

Carefully read each of the statements below and check the corresponding box if the statement applied to you **before** you turned eighteen-years-old.

☐ Your parents or guardians were separated or divorced
☑ You lived with a household member who served time in jail or prison
☑ You lived with a household member who was depressed, mentally ill, or attempted suicide
☐ You saw or heard household members hurt or threaten to hurt each other
☑ A household member swore at, insulted, humiliated, or put you down in a way that scared you
☑ A household member acted in a way that made you afraid that you might be physically hurt
☐ Someone touched your private parts in a sexual way in or in a way that made you feel uncomfortable
☐ Someone touched your private parts in a sexual way against your will
☐ Someone asked you to touch their private parts in a sexual way or in a way that made you uncomfortable
☑ Someone forced you to touch their private parts against your will
☐ More than once, you went without food, clothing, a place to live, or had no one to protect you
☑ Someone pushed, grabbed, slapped, or threw something at you
☑ You were hit so hard that you were injured or had marks
☑ You lived with someone who had a problem with drinking or using drugs
☐ You often felt unsupported, unloved, and/or unprotected
☐ You have been in foster care
☑ You have experienced harassment or bullying at school
☑ You have lived with a parent or guardian who died
☐ You have been separated from your primary caregiver through deportation or immigration
☐ You have had a serious medical procedure or life-threatening illness
☑ You have often seen or heard violence in the neighborhood or in your school neighborhood
☑ You have been detained, arrested, or incarcerated
☑ You have often been treated badly because of race, sexual orientation, place of birth, disability, or religion
☑ You have experienced verbal or physical abuse or threats from a romantic partner (*i.e.*, boyfriend or girlfriend)

Childhood Experiences Survey completed by David Wells, May 2025. David's mother and grandmother also reported David experiencing many of the ACEs he identified and some that he didn't. David's mother Debbie, and his grandmother, Linda both report that Debbie was in an abusive marriage to a man named James during David's childhood. According to Linda and Debbie, James violently abused Debbie and David. David didn't meet his biological father until he was fifteen years old. At the time David was born, Debbie had a restraining order against David's biological father. Linda reports that because of the abuse by James and neglect by Debbie, David and his brother came to live with her when he was six months old. Still, David often spent nights and weekends with his mother and James, during which James would physically harm David and withhold food from him. *See* Exhibit 1, South

9

Carolina Department of Mental Health (SCDMH), April 1, 2021 Competency Evaluation at 2. Debbie says that David and his older brother witnessed James try to drown her. One of the most vivid memories Debbie has of James' abuse of David is her husband throwing David against a wall when he was two or three years old.

After the attempted drowning, Debbie left James and took her children to live with her mother, Linda. However, Debbie eventually went back to David's stepfather. She says it was a "family decision" for her children to live with Linda. Debbie stayed married to James for nine years; they divorced in 2005 when David was around age twelve. Debbie maintained regular and frequent contact with David. Since they no longer lived with her, Debbie says her children stopped seeing James abuse her. However, when she visited her kids, she did so with visible bruises and injuries that she would make up stories about when asked. Although Debbie reports that the Department of Social Services (DSS) wasn't involved with her family, she was ordered to pay child support to Linda for David's care, *see* Exhibit 2, June 10, 2008, Order of Financial Responsibility, and David was separated from his sisters when they were removed from Debbie's home in 2007, possibly for alleged sexual molestation, but not placed with David and his grandmother. *See* Exhibit 5, Anderson County Sheriff's Office Records at 1.

In 2007, when David was fourteen., Linda reported to DSS that Debbie no longer wanted to be responsible for her sons. Linda also told the DSS caseworker that James treated David badly. *See* Exhibit 7, DSS Records. When David was fifteen, Debbie says David's biological father returned and attempted to "take over" raising David. When David was sixteen, he wanted to try and have a relationship with his father. His father came to South Carolina from Michigan, picked David up, and took him back home to Michigan. According to Linda, within three hours of David and his father's arrival in Michigan, she was contacted by law enforcement who told her that David was found sitting in a cornfield and his father

10

refused to come get him. Linda arranged for her family in Michigan to take David until her family in Tennessee could pick him up. Later, Linda retrieved David from Tennessee, though it's not exactly clear when. David has been in South Carolina ever since. When David was sixteen, he had a harrowing encounter with Steven Fletcher, who nearly ran David over with a van and pointed a gun at his head. Ex. 5 at 5–9. A neighbor, Robert Hamilton, witnessed the event and reported it to law enforcement. *Id.* And in 2011 and 2012, David was physically assaulted, struck in the head, by different people. *Id.* at 10–13.

As a student, David struggled in school almost from the outset. According to Linda, David had to repeat either the first or second grades. He received special education via an individual education plan and was taught in a self-contained classroom. *See, e.g.*, School Records at 3. In 2008, as an eighth grader, David also scored below basic on Palmetto Achievement Challenge Tests for Mathematics, English language arts, and social studies. *See id.* at 1–2. Despite David's intellectual challenges, he did and does his best. He graduated from Wren High School in 2011 without a diploma but received a certificate of participation. *See* Ex. 1 at 3. Linda reports that at the time of David's graduation, he was on a fourth-grade level for math and a third-grade level for reading. And when called upon by defense counsel to complete an introductory survey, he did not refuse the task:

Please let us know if there are any additional thoughts or things you think we should know.

I tryed to answer these questions the Best I could MY mom and grandma know more about these health questions than I do.

Introductory Client Survey Completed by David Lynn Wells at 12, May 2025.

David's intellectual challenges were compounded and exacerbated by mental illness that also began early in his childhood. Debbie and Linda report that David received mental health services as a child and was diagnosed, to the best of their memory, with bipolar disorder, depression, ADHD, and a sleeping disorder. He was also prescribed Adderall, Zoloft, and Clonidine. Linda also reported that David began self-harming in kindergarten and started cutting himself in the third grade. *See* Exhibit 8, SCDMH, Criminal Responsibility and Capacity to Conform Report at 4. In 2008, a judge ordered that David undergo a mental health evaluation at the Department of Juvenile Justice. *See* Exhibit 4, August 11, 2008 Letter. In 2009, a teacher reported to law enforcement that David scratched his arms until they bled. Ex. 5 at 4. Law enforcement discussed the incident with Linda, but "did not feel the need to have DSS involved with this case". *Id.* Debbie and Linda also witnessed David picking at his skin until sores appeared and then picking the sores. While Linda and Debbie were able to provide some information, they appeared reluctant to discuss David's mental health history, possibly fearing the stigmatization associated with mental illness, particularly given David's criminal charges. Since being incarcerated for state charges in 2020, David has received several other mental health and substance abuse diagnoses, including: ADHD, disruptive mood disorder, unspecified mood disorder, unspecified psychotic disorder, schizoaffective disorder, depressed learning disorders, stimulant use disorder (methamphetamines and cocaine), and opioid use disorder. *See* Exhibit 6, Medical Records, Anderson County Detention Center. After undergoing a Criminal Responsibility and Capacity to Conform evaluation in 2021, David was also diagnosed with Borderline Personality Disorder (BPD). *See* Ex. 8. David's BPD diagnosis is particularly relevant to his background and characteristics, and the role that trauma played in the commission of the instant offense because,

12

Trauma recognition can be obscured when its effects are attributed to other diagnoses, particularly in the relationship between cPTSD and its closest nosological neighbour, borderline personality disorder (BPD). Patients labelled with BPD are overwhelmingly traumatised: 71% of those diagnosed have experienced complex trauma, and they are 3.15 times more likely to have endured childhood maltreatment compared with adults with other psychiatric disorders and 13.91 times more likely than the general population. cPTSD was specifically designed to offer a kinder label to these individuals, as its originator, Judith Herman, noted that being diagnosed with a personality disorder was often perceived as 'little more than a sophisticated insult'.

Jay Watts, *Complex trauma and the unseen: who gets to be a victim?*, 27 BMJ Mental Health 1, 3 (2024). Furthermore, in addition to the injuries David incurred from being thrown into a wall by his stepfather when he was a toddler, head trauma David suffered from assaults in 2011 and 2012, he also reports that he has attempted suicide almost every year since his youth, including by banging his head against the wall.[5]



Picture taken of David while incarcerated at the Anderson County Detention Center

---

[5] David has received further mental health evaluation while incarcerated at the South Carolina Department of Corrections (SCDC). *See* Exhibit 9, SCDC Records. While at SCDC, David has been housed at six different facilities and has spent significant time in the Restricted Housing Unit, including in solitary confinement, due to other inmates becoming aware of the details of David's case when it appeared on the news, which was broadcast on the TVs in general population. *See id.*

IV.    **18 U.S.C. § 3553(b)**

Under 18 U.S.C. § 3553(b)(2)(A)(ii),

In sentencing a defendant convicted of . . . an offense under chapter . . . 110, . . . the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless— . . .

(ii) the court finds that there exists a mitigating circumstance of a kind or to a degree, that—

(I) has been affirmatively and specifically identified as a permissible ground of downward departure in the sentencing guidelines or policy statements issued under section 994(a) of title 28, taking account of any amendments to such sentencing guidelines or policy statements by Congress;

(II) has not been taken into consideration by the Sentencing Commission in formulating the guidelines; and

(III) should result in a sentence different from that described.

In *United States v. D.W.*, 198 F. Supp. 3d 18 (E.D.N.Y. 2016), the late Judge Jack B. Weinstein, who was a member of Thurgood Marshal's legal team that litigated *Brown v. Board of Education*, authored a brilliant Judgment, Memorandum and Order on Sentencing (Order) determining a sentence in a case with a defendant similarly situated to David. In *D.W.*, Judge Weinstein cited 3553(b) and discussed several other tenets of law and factual considerations that David prays the Court will take into consideration when determining his sentence. For that reason, David incorporates Judge Weinstein's Order in its entirety by reference. *See* Exhibit 10, J. Weinstein Order. At sentencing, defense counsel will rely on Judge Weinstein's Order as persuasive authority when requesting a sentence below the Guidelines range.

V.    **CONCLUSION**

Quite frankly, because of the nature and circumstances of the David's offense, and the length of imprisonment he faces under the Guidelines, his life is at stake. *See* Exhibit 11,

14

Affidavit of Paul Gibson. What he did cannot be minimized or excused. But it can, and should, be considered holistically, in the context of who David is, what he's endured, and what led to the commission of this offense. When viewed through that lens, the Court will conclude that David's offense should not cost him his life. Accordingly, he requests that the Court imposes a below-Guidelines sentence.

Respectfully submitted,

*s/Judea S. Davis*
Judea Shechinah Davis (D.S.C. Fed. Bar #13440)
Assistant Federal Public Defender
75 Beattie Place, Suite 950
Greenville, South Carolina 29601
(864) 235-8714
judea_davis@fd.org

Greenville, SC
April 21, 2026